**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7                              UNITED STATES DISTRICT COURT

8                              NORTHERN DISTRICT OF CALIFORNIA

9

                                                    No. C-05-3246 MHP
10   HEATHER NORDBERG, WILLIAM SMITH, JULIE
     BUTLER, FAYE E. TABER, and PATRICIA              **MEMORANDUM  & ORDER**
11   DOUGLAS-WARDEN, on behalf of themselves and      **Motion to Dismiss**
     all others similarly situated,
12
                    Plaintiffs,
13
          vs.
14
     TRILEGIANT COPORATION, a/k/a TRL GROUP, a
15   Delaware Corporation; and CENDANT
     CORPORATION, a Delaware Corporation,
16
                    Defendants.
17   _____/

18

19        Plaintiffs Heather Nordberg, William Smith, Julie Butler, Faye E. Taber and Patricia

20   Douglas-Warden brought this class action against defendants Trilegiant Corporation ("Trilegiant")

21   and its former parent corporation Cendant Corporation ("Cendant"), alleging in their first amended

22   complaint: (1) violations of the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18

23   U.S.C. sections 1962(c) and 1962(d); (2) violations of the Electronic Funds Transfer Act ("EFTA"),

24   15 U.S.C. sections 1693 et seq.; (3) violations of the Consumers Legal Remedies Act ("CLRA"),

25   Cal. Civ. Code sections 1750 et seq.; (4) violations of California's business practice laws, Cal. Bus.

26   & Prof. Code sections 17200 and 17500 et seq.; (5) conversion; (6) unjust enrichment; and (7)

27   declaratory relief pursuant to 28 U.S.C. section 2201 et seq.

28
                                          1

1    Now before the court are two separate motions, filed by Trilegiant and Cendant, to dismiss

2    portions of the complaint.  Having considered the parties' arguments and submissions and for the

3    reasons set forth below, the court enters the following memorandum and order.

4

5    <u>BACKGROUND</u>[1]

6    Trilegiant, a/k/a TRL Group, is a corporation organized under the laws of Delaware with its

7    principal place of business in Norwalk, Connecticut.  Cendant was formerly the parent company of

8    Trilegiant.  Cendant is also organized under the laws of the state of Delaware with its principal place

9    of business in New York, New York.  Trilegiant and Cendant (collectively "defendants") are both

10   registered with the California Secretary of State as corporations qualified to do business in

11   California.   Plaintiffs allege that Cendant is the alter ego of Trilegiant and thus directly liable for all

12   Trilegiant's allegedly unlawful acts.  In the alternative, plaintiffs allege that Cendant is vicariously

13   liable for the acts of its subsidiary.

14   Trilegiant is in the business of marketing and selling membership programs for goods and

15   services.  The aim of these programs is to provide information and/or discounts on various goods

16   and services to consumers for a periodic "membership fee" which ranges from $8.99 to $480.00.

17   According to plaintiff, defendants assess these periodic membership fees against the accounts of the

18   consumer (such as their credit or debit cards) on a monthly, bi-monthly, semi-annual and/or annual

19   basis.  Examples of the types of programs sold by defendants include "Shoppers Advantage"—a

20   catalog and on-line shopping membership, "Buyers Advantage"—a retail product warranty

21   extension/product repair membership, and "Privacy Guard" (a/k/a "Credit Alert")—a credit report

22   and credit monitoring membership.

23   Plaintiffs allege that in order to market their products, defendants enter into agreements with

24   financial institutions, retailers, telephone service providers, car rental companies, mortgage lenders,

25   hotels and cable companies.  Pursuant to these "third-party contracts" defendants, in exchange for

26   valuable compensation, obtain personal financial and billing information about the customers of

27   these companies.  Defendants use this personal financial information to market, sell and ultimately

28

United States District Court
For the Northern District of California

2

United States District Court

For the Northern District of California

charge consumers for their membership programs.  Defendants often include the name of their contracting partner on their marketing materials—a practice which has the effect of misrepresenting to the consumer that such membership program is sponsored or sold by the partner company.

Defendants market and sell their membership programs through a series of direct mail, Internet, and telemarketing solicitations.   In addition, defendants routinely send checks or other premiums to consumers.  These premiums are styled as "rewards" for being valued customers.  However, after cashing the checks or after accepting the "free" or "no charge" premiums, consumers are often automatically enrolled in one or more of defendants' membership programs.  Consequently, plaintiffs contend, without the consent of the consumer, periodic charges are assessed against the consumer's financial accounts unless the consumer affirmatively cancels the membership within a specified time period.

Defendants also offer "free" trial memberships to consumers but fail to disclose that at the expiration of such trial period, the financial accounts of these consumers will be automatically charged for a one-year membership without their authorization.  As in the case of the premium checks, unless a consumer affirmatively cancels the membership, the individual will continue to be charged for successive membership periods.

Even when a consumer does attempt to cancel his membership, defendants often fail to honor cancellation requests, to refund any unauthorized charges or even to remove these consumers from the membership programs from which they have requested to be de-listed.

The named plaintiffs in the present action are consumers who allege either that they have been automatically enrolled in one of defendants' membership programs following a free trial membership or were charged for membership in one of defendants' programs with no prior contact with defendants or their representatives.

Nordberg and Smith are the only California residents amongst the named plaintiffs.  Nordberg alleges that she was solicited by defendants in connection with the "Credit Alert" service, expressly declined such service, but nevertheless received information in the mail about the service a week later.  Plaintiffs allege that Nordberg subsequently contacted defendants' representatives by

3

phone reiterating her desire not to be a member of defendants' programs.  She was allegedly reassured by defendants' representative that she was not enrolled and would not be charged any membership fees.  Nonetheless, Nordberg later discovered charges on her account for these membership programs.  Smith, on the other hand, had no interaction with defendants prior to discovering unauthorized charges on his credit card statement in September of 2004, and in April and May of 2005.  When he contacted defendants' representatives to have the unauthorized charges removed, defendants allegedly assured him that his membership had been canceled as of November 26, 2004 but refused to refund any assessed membership fees prior to that time.  There is no indication that despite this representation, Smith's membership was not cancelled or that it remained active.  Douglas-Warden is the only named plaintiff who alleges that she was induced, through an internet pop-up advertisement, to accept a free-trial membership.  Smith, Butler and Taber allege that they had no contact with defendants prior to noticing charges on their consumer accounts.

In any event, in all cases, the named plaintiffs assert that defendants debited amounts from their credit or debit card accounts without the prior approval of the plaintiffs.  To date, plaintiffs allege, these unauthorized charges have not been fully reimbursed.

Consequently, on August 9, 2005 plaintiffs brought suit in this court, alleging that defendants violated RICO by engaging in repeated acts of wire fraud, and violated the EFTA, the CLRA and the California Business & Professions Code.  Plaintiffs also allege that through their actions, defendants have engaged in conversion and were unjustly enriched.  Plaintiffs seek declaratory and injunctive relief, restitution of all monies acquired from plaintiffs during the class period and treble damages pursuant to 18 U.S.C. section 1964.  Plaintiffs allege that the class consists of "all people who have been charged for one of [sic] more of Trilegiant['s] membership programs during the period of August 9, 2001 to the present."  FAC ¶ 47.  Plaintiffs also propose two sub-classes limited to (1) those individuals whose debit or bank card accounts were debited in violation of the EFTA (the "EFTA Subclass") and (2) those individuals who reside in California (the "California Subclass").

On December 19, 2005 Trilegiant filed a motion to strike plaintiffs' First through Fourth, Eighth and Ninth causes of action in the complaint—plaintiffs' claims of conversion and violations

4

United States District Court
For the Northern District of California

of California's business practice laws remain unchallenged.  On the same day, Cendant separately filed a motion to dismiss all claims against Cendant based on assertions of alter ego, vicarious and aiding and abetting liability.

LEGAL STANDARD

I.    Motion to Dismiss

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim."  Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  Because Rule 12(b)(6) focuses on the "sufficiency" of a claim rather than the claim's substantive merits, "[o]rdinarily, a court may look only at the face of the complaint to decide a motion to dismiss."  Van Buskirk v. Cable News Network, Inc., 284 F.3d 977, 980 (9th Cir. 2002).  Under Rule 12(b)(6), "unless it appears beyond doubt that plaintiff can prove no set of facts in support of her claim which would entitle her to relief," a motion to dismiss must be denied.  Lewis v. Telephone Employees Credit Union, 87 F.3d 1537, 1545 (9th Cir. 1996) (citation omitted); see also Conley v. Gibson, 355 U.S. 41, 45–46 (1957).

DISCUSSION

In their respective motions to dismiss, defendants allege that (1) plaintiffs are unable to state a claim under either section 1962(c) or 1962(d) of RICO, (2) plaintiffs are not "financial institutions" for purposes of the EFTA, (3) plaintiffs' claims under the CLRA fail as a matter of law, (4) plaintiffs have not plead fraud with particularity under Federal Rule of Civil Procedure Rule 9(b) and (5) plaintiffs may not pierce the corporate veil to reach Cendant.

I.    Racketeer Influenced and Corrupt Organizations

In order to state a claim under RICO, a plaintiff must allege that one or more defendant "persons" conducted or participated in the affairs of an "enterprise" through a "pattern of racketeering activity."[2]  18 U.S.C. § 1962(c).  A "person" is defined as "any individual or entity

capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).   As Cendant and Trilegiant are recognized legal entities, they are "persons" within the meaning of RICO.  The dispositive issue with respect to plaintiffs' RICO claims is whether plaintiffs have adequately pled the existence of an enterprise.

A.   **Enterprise**

RICO defines an "enterprise" as including either (1) "any individual, partnership, corporation, association, or other legal entity," or (2) "any union or group of individuals associated in fact although not a legal entity ('associated-in-fact')." 18 U.S.C. § 1961(4).  A RICO enterprise must possess three essential characteristics: (1) a common or shared purpose; (2) continuity of structure and personnel; and (3) an ascertainable structure distinct from that in the pattern of racketeering activity.  See Chang v. Chen, 80 F.3d 1293, 1296 (9th Cir. 1996).

Plaintiffs assert that they have properly alleged the existence of an enterprise under RICO. In opposition to defendants' motion to dismiss, plaintiffs offer two separate alternatives to satisfy the RICO "enterprise" requirement.  First, plaintiffs contend that defendants, as the parent and subsidiary corporations, constitute both  the "enterprise" and the "person" liable under RICO.  In the alternative, plaintiffs assert that the contractual agreements between defendants and third parties granting defendants access to the consumer information of these third-parties constituted an association-in-fact "enterprise" for the purposes of RICO.

**1.   Parent and Subsidiary as Enterprise**

Plaintiffs' first enterprise theory—that since Cendant and Trilegiant stand as separately incorporated entities, they satisfy the enterprise requirement—is not evident in their complaint and as a result this court may not consider it.[3]  Although the complaint states that  "[d]efendants, and each of them, are '*persons*' within the meaning of . . . [section] 1961(3)," see FAC ¶ 58 (emphasis added), it does not also name defendants as the sole entities constituting the RICO enterprise.   The complaint clearly specifies that "[d]efendants, *by and through agreements with third party entities* . . . constitute an enterprise." FAC ¶ 59 (emphasis added).  Additionally, at a case management conference in December 2005, plaintiffs confirmed that the enterprise was "Trilegiant *with these*

**United States District Court**
For the Northern District of California

6

1  unnamed third parties . . ." Posner Dec., Exh. A at 10: 20-21.   As courts are barred from

2  considering new matter that is raised by a plaintiff in an opposition to dismiss, <u>see</u> <u>Broam v. Bogan</u>,

3  320 F.3d 1023, 1026 n.2 (9th Cir. 2003), this court may not consider plaintiff's newly minted theory

4  of a RICO enterprise.

5       Not only are plaintiffs precluded from attempting to amend their complaint in opposition to a

6  motion to dismiss, it is worth noting that their legal arguments lack merit and evidence a

7  fundamental misapprehension of the applicable law.  Section 1962(c) requires a plaintiff to allege as

8  a defendant the "person" or "persons" who are distinct from the "enterprise" and whose business the

9  enterprise is conducting.  <u>Sever v. Alaska Pulp Corp.</u>, 978 F.2d 1529, 1533 (9th Cir. 1992).   In other

10  words, "a single individual or entity cannot be both the RICO enterprise and an individual RICO

11  defendant [or "person" as] . . . an individual cannot associate or conspire with himself."  <u>River City</u>

12  <u>Markets, Inc. v. Fleming Foods West, Inc.</u>, 960 F.2d 1458, 1461 (9th Cir. 1992) (citing <u>Rae v. Union</u>

13  <u>Bank</u>, 725 F.2d 478 (9th Cir. 1984)).  Furthermore, the Ninth Circuit has specifically held that "for

14  purposes of a single action, a single corporate defendant cannot be both the RICO person and the

15  RICO enterprise under section 1962(c)."  <u>Wagh v. Metris Direct, Inc., et al.</u>, No. C-01-01711 TEH,

16  2002 WL 257846 (N.D. Cal. Feb. 20, 2002) (Henderson, J.) (quoting <u>Sever,</u> 978 F.2d at 1533–34),

17  <u>aff'd</u>, 363 F.3d 821 (9th Cir. 2003).  As this enterprise theory rests on a misguided notion that

18  defendants can be both the RICO person and enterprise, it must fail.

19

20            **2.        Association-in-Fact Enterprise**

21       Plaintiffs' theory that the existence of third party contracts between defendants and certain

22  financial institutions constitutes an association-in-fact enterprise is similarly unavailing.  The Ninth

23  Circuit has held that for an entity to constitute an enterprise,  "[a]t a minimum . . . [the] entity must

24  exhibit 'some sort of structure . . . for the making of decisions, whether it be hierarchical or

25  consensual.'"  <u>Chang</u>, 80 F.3d at 1299 (quoting <u>U.S. v. Riccobene</u>, 709 F.2d 214, 222 (3d Cir.), <u>cert.</u>

26  <u>denied</u>, 464 U.S. 849 (1983)).   Furthermore, the structure must provide a mechanism for controlling

27  and directing the affairs of the group "on an ongoing, rather than an ad hoc, basis."  <u>Id</u>. (quoting

28  <u>Riccobene</u>, 709 F.2d at 222).  Thus, in order to establish an association-in-fact enterprise, a plaintiff

1    must plead facts which show that (1) there is an ongoing organization, formal or informal, (2) that

2    the various associates function as a continuing unit, and (3) that the organization is an entity separate

3    and apart from the pattern of racketeering activity in which it engages.  Chang, 80 F.3d at 1297.

4    Stated differently, plaintiffs must allege some kind of structure independent of the racketeering or

5    predicate acts, such as an independent decision-making structure or an independent proceed-

6    distributing structure that was used to commit the predicate acts.  See Wagh, 2002 WL 257846, at

7    *3.

8         Not only have plaintiffs failed to identify any sort of independent structure, they have failed

9    to demonstrate how their alleged enterprise is separate from the alleged racketeering acts.  The

10   complaint is devoid of any allegations that these third-party contractual agreements formed a

11   hierarchical or consensual structure which provided a mechanism for controlling the affairs of the

12   alleged enterprise.[4]  All that is alleged is that defendants entered into these agreements with

13   numerous third-parties—who notably are unnamed in the complaint[5]—and through the information

14   gained from these agreements, committed their fraudulent acts.  Plaintiffs make no allegations that

15   defendants and these unnamed third parties worked in concert to engage in the alleged racketeering

16   activities or to distribute its proceeds.[6]

17        As currently pled, plaintiffs' RICO enterprise comprises nothing more than the agreements

18   entered into by defendants and certain unnamed third parties to purchase consumer financial

19   information.  However, under Chang, an adequately pled enterprise must constitute more than the

20   sum total of the predicate acts.  In the instant action, the complaint does not allege that the

21   contractual agreements are in any way separate from the alleged racketeering[7] but rather alleges that

22   these agreements formed a key basis of defendants' racketeering activities.  See FAC ¶ 20.

23        Although contractual relationships may form the basis of an association-in-fact enterprise,

24   they are not sufficient to establish a RICO enterprise.  See Federal Reserve Bank v. HK Systems,

25   Inc., No C-95-1190, 1997 WL 765952 (N.D. Cal. Nov. 12, 1997) (Patel, J.) (where this court noted

26   that merely demonstrating the existence of third-party contracts does not adequately allege an

27   ascertainable structure separate from the racketeering activities).  Plaintiffs' relies on the Ninth

28   Circuit's decision in River City Markets, 960 F.2d at 1461–62, for the proposition that the existence

United States District Court
For the Northern District of California

of contractual agreements between parties is sufficient to establish an enterprise; that case is inapposite. In River City Markets, the court found that routine business contracts between entities, although clearly "associations-in-fact," cannot rise to the level of a RICO enterprise unless there is evidence of involvement of the different associates in some misconduct based upon these agreements. 960 F.2d at 1461–62. Thus, the court found appellants' allegations insufficient to establish a RICO enterprise for summary judgment purposes as there was no "evidence of any contemplated overreaching, deceit, non-disclosure, manipulation of inventory, or any other unethical conduct by [the parties]." Id at 1463. See also Smith & Hawken, Ltd. v. Gardendance, Inc., No. C 04-1664, 2004 WL 2496163 at *8 (N.D. Cal. Nov. 5, 2004) (Armstrong, J.) (finding a failure by defendants in their counterclaim to allege an enterprise "pursuant to the numerous agreements that were negotiated and executed between the plaintiff and Chinese suppliers as well as through their course of conduct" since there were no facts offered "indicating how the enterprise is organized, explaining the 'chain of command or operation of the enterprise'"); Doe I v. The Gap, Inc, No. CV-01-0031, 2001 WL 1842389, at *3 (N. Mar. I. 2001) (finding an association-in-fact enterprise consisting of "various contracts and agreements between single retailers and single manufacturers" where there were "allegations of collusion" between these retailers and manufacturers). In the present action, plaintiffs do not allege any wrongdoing on the part of the third-party contractors nor do they allege that these entities were aware of the allegedly fraudulent activities. Rather, plaintiffs' enterprise theory is based squarely upon the existence of routine contractual relationships between defendants and certain unnamed third-parties.

Wagh, a recently decided and similarly postured case in this district, is on all fours with the current action. In Wagh, plaintiff asserted RICO violations for allegedly improper charges assessed for membership in defendants' credit protection program. In their first enterprise theory, the Wagh plaintiffs contended that defendants (comprising the parent and subsidiary company) constituted the enterprise. Plaintiffs also argued that an association-in-fact enterprise was evident from the contractual relationship between the parties. In rejecting both claims, the district court found that not only could plaintiffs not be both the RICO person and enterprise, but that plaintiffs did not allege any facts demonstrating the existence of either "an independent decision-making structure" or an

1    "independent proceed-distributing structure." Wagh, 2002 WL 257846 at *3.  The court found that

2    plaintiff was improperly attempting to impose RICO liability "based [simply] upon Citibank's

3    [—the third-party contractor in that case—] regular practices of receiving charges, paying charges

4    and billing cardholders."  Id.   In affirming the district court decision, the Ninth Circuit held that

5    plaintiff had failed to demonstrate that there was a "a system of making decisions in furtherance of .

6    . . [defendants'] alleged criminal activities, independent from their respective *regular business*

7    *practices*.  Nor ha[d] plaintiff alleged that an independent system of distributing the proceeds of

8    money . . ." existed.  Wagh, 363 F.3d 821, 831 (9th Cir. 2003).

9          Here, as in Wagh, the allegedly improper billing scheme perpetuated through the third-party

10   contracts is *both* the alleged racketeering activity and the enterprise.  The complaint does not allege

11   that there is an independent structure which is separate from the predicate acts.  Indeed, the predicate

12   acts themselves are improperly pled.  Plaintiffs simply allege with little precision that defendants

13   have "committed wire fraud hundreds of thousands or millions of times over the past four years . . ."

14   FAC ¶ 61.  Under governing Ninth Circuit law, plaintiffs have failed to adequately plead a RICO

15   enterprise.  Absent an underlying RICO violation, plaintiffs' conspiracy claim under 1962(d) is

16   untenable.

17         Therefore, defendants' motion to dismiss plaintiffs' RICO claims is GRANTED with leave

18   to amend if plaintiffs can allege facts sufficient to identify an independent structure separate from

19   the predicate acts, to more clearly specify the entities which comprise its association-in-fact

20   enterprise and to plead with precision the predicate acts of their RICO claim.

21

22   II.    Electronic Funds Transfer Act

23         Trilegiant challenges plaintiffs' claims under the EFTA on the grounds that (1) sections

24   1693f and 1693h apply exclusively to financial institutions (which Trilegiant is not) and (2)

25   plaintiffs fail to adequately specify the sections of the act upon which they intend to rely.  In

26   response, plaintiffs assert that defendants ignore their claim for civil liability under section 1693m,

27   which applies to "any person."  Additionally, plaintiffs argue that although they do not expressly

28   name section 1693e in their pleadings, plaintiffs' allegations that defendants assessed periodic

United States District Court

For the Northern District of California

membership fees for their membership program without oral or written consent from plaintiffs provides adequate notice that defendants are subject to liability under section 1693e.

The EFTA is consumer law aimed at "provid[ing] a basic framework [to] establish[] the rights, liabilities, and responsibilities of *participants* in electronic fund transfer systems." 15 U.S.C. §1693e (emphasis added). An "electronic fund transfer" is defined as "any transfer of funds . . . which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a *financial institution* to debit or credit an account." 15 U.S.C. §1693a(6) (emphasis added).[8] "[F]inancial institution" is defined as "a bank, savings association, credit union, or any other person that directly or indirectly holds an account belonging to a consumer, or that issues an access device and agrees with a consumer to provide electronic fund transfer services." 15 U.S.C. §1693a. Although the actions alleged in plaintiffs' complaint involve the debiting of credit and/or debit card accounts, there is no indication, and plaintiffs do not dispute, that either defendant is a "financial institution." Moreover, given plaintiffs' withdrawal of their claim for treble damages under 1693f and h, defendants' motion to dismiss plaintiffs' claims under those sections is moot.

The only remaining statutory provision to which plaintiffs specifically cite, section 1693m, is not a basis of liability under the statute, but simply an enforcement mechanism for other statutory provisions. Pursuant to section 1693m "*any person* who fails to comply with *any provision* of this title with respect to *any consumer* . . . is liable to such consumer . . ." 15 U.S.C. § 1693m (emphasis added). However, although, plaintiffs do not specifically cite to section 1693e in their complaint, they are correct that their allegations fall within the ambit of this provision. The gravamen of plaintiffs' complaint is that defendants failed to obtain authorization from plaintiffs prior to periodic electronic withdrawals from their financial accounts. An "unauthorized electronic fund transfer" is defined by the statute as "an electronic fund transfer from a consumer's account initiated by *a person other than the consumer without actual authority* to initiate such transfer and from which the consumer receives no benefit." 15 U.S.C. §1693a(11) (emphasis added). Section 1693e which deals with the requirements for pre-authorized transfers provides that

in the case of preauthorized transfers from a consumer's account to the same person which may vary in amount, the financial institution *or designated payee shall*, prior to each transfer,

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

provide reasonable advance notice to the consumer, in accordance with regulations of the Board, of the amount to be transferred and the scheduled date of the transfer.

15 U.S.C. § 1693e(b) (emphasis added).

The statute's implementing regulations, known as "Regulation E" and codified at 12 C.F.R. section 205 et seq.. note that "the person that obtains the authorization" for a preauthorized electronic funds transfer is required to obtain a signed or similarly authenticated authorization from the consumer and is required to provide a copy of this authorization to the consumer.  12 C. F. R. § 205.10(b)(emphasis added).[9]  Furthermore, section 205.10(d) indicates that "the *designated payee or the financial institution*" must provide a customer a written notice of the amount and date of transfer. 12 C.F.R. § 205.10(d) (emphasis added).  Similarly, the Official Staff Interpretations ("OSI") of Regulation E expressly state that for "authorization obtained by a third party . . . the account-holding financial institution does not violate the regulation when a third-party payee fails to obtain the *authorization in writing* or fails to give a copy to the consumer, rather it is the third-party payee that is in violation of the regulation."  Regulation E, Supp. I, Part 10(b)(emphasis added).   It is clear that plaintiffs' allegations that defendant failed to secure authorization from plaintiffs is supported by the plain text of the EFTA and its implementing regulations.  Nonetheless, the court finds that plaintiffs' broad averments of violations of the EFTA are inadequate and that their claims must be amended to make specific reference to the portions of the act upon which they intend to rely.

Defendant's motion to dismiss plaintiffs' claims under the EFTA is therefore GRANTED with leave to amend to allege the proper sections of the EFTA and supportive facts in accordance with the foregoing.

III.    Consumer Legal Remedies Act

Defendants contend that plaintiffs' claims under the CLRA fail as a matter of law because (1) plaintiffs are not "consumers" within the meaning of the statute; (2) plaintiffs' experiences with Trilegiant do not meet the statutory definition of a "transaction"; (3)  plaintiffs' allegations of fraud under the CLRA do not meet the requirement of particularity under Rule 9(b); and (4) plaintiffs' allegations of unconscionable contract terms fail to state a claim under the CLRA.

**A.     Consumers**

Pursuant to section 1770 of the CLRA, "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a *transaction intended to result or which results* in the sale or lease of goods or services to *any consumer*" are barred. Cal. Civ. Code § 1770(a) (emphasis added).   The CLRA defines consumer as "an individual who *seeks or acquires*, by purchase or lease, *any goods or services* for personal, family or household purposes." Id. at §1761(d) (emphasis added).  In a tortured reading of the statute, defendants argue that because plaintiffs assert that they did not "seek" nor desire Trilegiant's products— as their allegations involve fraudulent misrepresentations or in some cases conversion—they do not fall within the statutory definition of a consumer.[10]  However, the CLRA's definition of a consumer is disjunctive —indicating that one need not "seek" in order to "acquire."  The Merriam-Webster Collegiate Dictionary defines "acquire" as "to get as one's own" or "to come into possession or control of, often by unspecified means." (11th ed. 2003).  Neither of these definitions requires affirmative or conscious action, let alone a desire for the subject to be acquired.

Furthermore, section 1760 of the CLRA provides that the statute is to be "liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices [which result in the sale of goods or services to a consumer] and to provide efficient and economical procedures to secure such protection." Cal. Civ. Code §§ 1760, 1770(a).  Membership in one of defendants' programs is clearly a "good or service" which plaintiffs have acquired whether of their own volition or thrust upon them as a result of defendants' allegedly fraudulent practices.  Given the CLRA's express policy to "liberally construe[]" the statute to protect consumers against unfair and deceptive business practices, this court rejects defendants' distorted reading of the statute and finds that plaintiffs meet the statutory definition of "consumer" even if they did not actually "seek" or desire the products or services which they received.  See Id. § 1760.

**B.     Transaction**

Pursuant to section 1761(e), a "transaction" is "an *agreement* between a consumer and any other person, whether or not the agreement is a contract enforceable by action, and includes the

1  making of, and the performance pursuant to, that agreement."  Cal. Civ. Code § 1761(e) (emphasis

2  added).  Defendants argue that the statute requires a "true agreement by the consumer" based on "a

3  bargain of the parties in fact"[11] and thus, plaintiffs Nordberg and Smith's averment that they did not

4  knowingly agree to be enrolled in defendants' membership programs does not amount to a

5  transaction.  In response, plaintiffs argue that the acts of accepting a "free" trial membership, or

6  being billed by defendants for costly memberships to which they did not agree are transactions

7  within the meaning of the CLRA.

8         Plaintiffs Nordberg and Smith—the only plaintiffs residing in California and therefore the

9  only plaintiffs with standing to enforce the CLRA against defendants—allege they had no

10  knowledge of being enrolled in defendants' programs until they discovered unauthorized charges on

11  their bank and credit card statements.  Plaintiffs contend that defendants' failure to inform Smith or

12  Nordberg that an account was being established in his/her name and that he/she would be assessed

13  membership fees for this service constitutes an "omission" actionable under the CLRA.   However,

14  the cases on which plaintiffs rely are unavailing as they all involve an omission where there was

15  already an underlying agreement.[12]  Absent an underlying agreement, the withdrawals of

16  membership fees and their subsequent discovery by Nordberg and Smith are not actionable under the

17  CLRA.

18         However, under a liberal construction of "transaction," Nordberg's subsequent

19  communications to defendants' representatives evidence an "agreement" that resulted in the

20  provision of services.  See Cal. Civ. Code. § 1770.  As aforementioned, section 1770(a) of the

21  CLRA states that unfair or deceptive practices "intended to result *or which result*[]" in the sale of

22  goods or services are unlawful.  In the present instance, the agreement was that Nordberg was not

23  enrolled and thus would not be assessed any fees, and later that she would receive a refund.  Given

24  defendants' subsequent billing of Nordberg for membership services, this agreement clearly

25  "resulted" in a sale of services.   Accordingly, this court finds that Nordberg engaged in a transaction

26  for purposes of the CLRA.

27         On the other hand, plaintiff Smith's interactions with defendants' agents do not involve any

28  form of "agreement."  Indeed, it is the express *lack* of agreement and the subsequent refusal to fully

14

refund the unauthorized charges that lie at the heart of Smith's complaint.  Accordingly, Smith has not stated a valid claim under the CLRA; his complaint is better handled as a common law claim for conversion.

### C.       Sufficiency of the Pleadings

Defendants assert that plaintiffs have failed to plead fraud with particularity under Federal Rule of Civil Procedure 9(b) because plaintiffs have not demonstrated both the existence of material misrepresentations and reliance by plaintiffs on any such representations.  Plaintiffs argue that the requirement that fraud be pled with particularity does not apply to causes of action under the consumer protection statutes such as the CLRA.

It is well established that Rule 9(b)'s requirement that allegations of fraud be pled with particularity applies to state-law causes of action before a federal court: "While a federal court will examine state law to determine whether the elements of fraud have been pled sufficiently to state a cause of action, the Rule 9(b) requirement that the *circumstances* of the fraud must be stated with particularity is a federally imposed rule."  Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1103 (9th Cir. 2003) (quoting Hayduk v. Lanna, 775 F.2d 441, 443 (1st Cir. 1985)).  See also Jenkins v. Commonwealth Land Title Ins. Co., 95 F.3d 791, 796 (9th Cir. 1996) (applying Rule 9(b) to pleading of state-law cause of action)).

However, Rule 9(b) is not strictly applicable to the current action as the CLRA is not a fraud statute.  As noted by the court in Vess, "fraud is not an *essential* element of a claim under [Cal. Civ. Code § 1770]."  Vess, 317 F.3d at 1105.   To require that plaintiffs prove more than the statute itself requires would undercut the intent of the legislature in creating a remedy separate and apart from common-law fraud.  Relief under the CLRA is available to those consumers who suffer "damage *as a result of* the use or employment by any person of a method, act, or, practice declared to be unlawful under section 1770."  Cal. Civ. Code §1780(a) (emphasis added).  Thus, for a misrepresentation to be actionable under section 1770 it need only "result" in damage to the consumer.  In the present action, plaintiffs allege misrepresentations pursuant to different subsections of CLRA's section 1770 and thus are not required to plead fraud with particularity but must merely demonstrate that the misrepresentations resulted in harm.

**United States District Court**
For the Northern District of California

1       Although Rule 9(b) is not applicable to heighten the pleading standard in this instance,

2  plaintiffs are still required to provide some specificity in their pleadings to put defendants on notice

3  of the charges leveled against them.  Defendants assert that plaintiffs fail to identify any false or

4  misleading advertising or actual solicitations designed to induce or which actually induced Nordberg

5  and Smith to join a membership club.  Aside from the actual advertisements or solicitations, both

6  plaintiffs do not allege any facts to support any harm resulting from defendants' advertising.  In

7  Nordberg's case, she specifically declined Trilegiant's offer of membership while in the case of

8  Smith there are no allegations that he was even aware of any of defendants' advertising.  As

9  plaintiffs have failed to aver any facts in support of Nordberg or Smith's claims under sections

10  1770(a)(1), (3), (5) and (9)—the sections of the CLRA which involve misrepresentations in

11  advertising—defendants' motion to dismiss those claims is GRANTED without leave to amend.

12       Plaintiffs have adequately pled that defendants made actionable misrepresentations under

13  sections 1770(a)(14).  Section 1770(a)(14) of the CLRA prohibits "represent[ations] that a

14  transaction confers or involves rights, remedies, or obligations which it does not involve, or which

15  are prohibited by law.  The complaint details Nordberg's personal experience with defendants'

16  representatives and the alleged misrepresentations that were made to her.  In paragraphs 29–31 of

17  the complaint plaintiffs provide the approximate dates (including month and year), the manner in

18  which Nordberg discovered she was enrolled in one or more of defendants' membership programs,

19  her interactions with defendants' agents regarding the memberships and the content of defendants'

20  alleged omissions.  This court finds defendants' representations to Nordberg that she would be

21  refunded any unauthorized charges amounts to a misrepresentation that she had a right to a refund

22  within the meaning of subsection 14.  Nonetheless, after this misrepresentation, further amounts

23  were withdrawn from Nordberg's account, resulting in an overdraft fee.  Plaintiffs have adequately

24  alleged both the existence of material misrepresentations and its causal relationship to the harm

25  suffered by Nordberg.   As Nordberg is clearly a consumer who engaged in "transactions" within the

26  meaning of the statute, and because plaintiffs claims are pled with sufficient particularity,

27  defendants' motion to dismiss plaintiffs' claims under sections 1770(a)(14) is DENIED.

28       However, under subsection 16 plaintiffs factual allegations are less clear.  Pursuant to

**United States District Court**

For the Northern District of California

subsection 16 "represent[ations] that the *subject of a transaction has been supplied* in accordance with a previous representation when it has not" are actionable.  Cal. Civ. Code §§ 1770(a)(16) (emphasis added).  It is unclear whether the "subject of the transaction" to which plaintiffs refer is defendants' representations that Nordberg was not enrolled and would not be charged or rather defendants representations that she would receive a refund.   It is also unclear what "subject" defendants represented had already been supplied within the meaning of subsection 16.  Plaintiffs are directed to amend their complaint to clarify the facts supporting their claim under subsection 16.

Indeed, there continue to be a number of problems with plaintiffs' poorly drafted cause of action under the CLRA.  First, plaintiffs' allegations under the CLRA are overbroad, alleging that plaintiffs accepted a "'free' trial of one (or more) of [d]efendants' membership programs."  See FAC ¶ 82.  The only named plaintiff who alleges being misled by defendants' advertising is Douglas-Warden—a non-resident of California who was solicited through an internet pop-up advertisement for a "free-trial" period.  All the remaining named plaintiffs allege that they merely discovered unauthorized charges on their accounts.  Thus, since there is no named plaintiff who resides in California and who accepted a "free trial" membership with Trilegiant, these allegations in plaintiffs' CLRA claims are unsubstantiated.  Plaintiffs may amend their complaint to allege what aspects of plaintiffs' claims establish that there is a transaction within the meaning of the CLRA, consistent with the court's discussion above.  As currently pled, the complaint defines the transaction as merely defendants' acts of  "assessing and collecting 'membership fees'." FAC ¶ 82.  As aforementioned, this is inadequate as it does not establish the existence of an agreement.

It is also worth noting that the nature of the misrepresentations alleged by plaintiffs—numerous personal interactions with defendants' representatives over the phone as opposed to a more generalized and uniform representation by defendants—may pose a future problem to plaintiffs at the class certification stage due to concerns about their typicality.

In accordance with the above, defendants' motion to dismiss plaintiffs' CLRA claim pursuant to section 1770(a)(16) is GRANTED with leave to amend consistent with the foregoing as to plaintiff Nordberg.  Defendant's motion to dismiss plaintiffs' CLRA claims with respect to Smith is GRANTED.

**United States District Court**
For the Northern District of California

**D.    Unconscionable Contract Provisions**

Defendants also move to dismiss plaintiffs' claims under the CLRA based on the assertion that the arbitration and choice-of-law provisions in contracts prepared by defendants are unconscionable.  Specifically, plaintiffs' complaint states that

> when consumers complain and/or petition the courts for relief from defendants' acts and practices, as described herein, defendants routinely present, rely upon, and seek to bind consumers to purported membership agreements, drafted by defendants, which contain choice of law and arbitration agreements that if enforced would unfairly, unlawfully, fraudulently and unconscionably require consumers to give up their constitutional and statutory rights to civil court and/or jury trial . . .

FAC ¶ 85.  Thus, plaintiffs request that this court grant declaratory relief that such provisions are invalid since they allegedly violate section 1770(a)(19) of the CLRA.[13]

Although plaintiffs allege that the provisions are unlawful and unconscionable, they do not give this court any insight as to the precise language of the provisions themselves or why they should be deemed unconscionable.  Plaintiffs have not alleged that either Nordberg or Smith ever signed or otherwise entered into a membership agreement or contract with defendants, let alone an agreement containing these arbitration and choice of law provisions.  Neither have plaintiffs alleged that defendants have attempted to enforce such contracts or arbitration/choice-of-law provisions against those particular plaintiffs or that plaintiffs have suffered damages as a result.  Indeed the gravamen of plaintiffs' complaint is that no such agreements were ever entered into.  The complaint expressly notes that consumers will be injured by these provisions "*if* [they] are enforced."  FAC ¶ 85 (emphasis added).  Plaintiffs have failed to state a claim upon which relief can be granted.  Defendants' motion to dismiss plaintiffs' claim concerning the unconscionability of these arbitration and choice-of-law provisions is GRANTED.

IV.    Unjust Enrichment

Defendants contend that unjust enrichment is not a recognized cause of action in California, but is rather only a legal remedy.  Additionally, defendants assert that this cause of action is superfluous and should be dismissed as plaintiffs already have a claim under section 17200 of the California Business and Professions Code under which, if they were to prevail, they would be awarded restitution.

18

The state and the federal courts appear to be unclear whether in California a court may recognize a claim for "unjust enrichment" as a separate cause of action.  See McBride v. Boughton, 123 Cal. App. 4th 379, 387 (2004) ("unjust enrichment is not a cause of action or even a remedy, but rather a general principle underlying various legal doctrines and remedies"); Lauriedale Assocs., Ltd. v. Wilson, 7 Cal. App. 4th 1439, 1448 (1992) ("the phrase '[u]njust [e]nrichment' does not describe a theory of recovery, but an effect: the failure to make restitution under circumstances where it is equitable to do so"); Enreach Tech, Inc. v. Embedded Internet Solutions, 403 F. Supp. 2d 968, 976 (N.D. Cal. 2005) (Wilken, J.) (citing McBride, 123 Cal. App. 4th at 387) ("unjust enrichment is not a valid cause of action in California."); Cf.  Hirsch v. Bank of America,107 Cal. App. 4th 708, 722 (2003) (reversing the lower court's dismissal of plaintiff's unjust enrichment claim upon finding that appellants stated a valid cause of action for unjust enrichment); see also Ghirardo v. Antonioli, 14 Cal. 4th 39, 43–44 (1996); Villager Franchise Sys. v. Dhami, Dhami & Virk, CV-F-04-6393, 2006 U.S. Dist. LEXIS 6114 (E.D. Cal. 2006) ("California law recognizes a cause of action for unjust enrichment") (citing Ghirardo v. Antonioli, 14 Cal. 4th 39, 51 (1996)); Gerlinger v. Amazon.com, Inc., 311 F. Supp. 2d 838, 856 (N.D. Cal. 2004) (Patel, J.) ("[u]nder California law, unjust enrichment is an action in quasi-contract") (citing Paracor Fin. v. Gen. Elec. Capital Corp., 96 F.3d 1151, 1167 (9th Cir. 1996)); Western Pac. R. Corp. v. Western Pac. R. Co., 206 F.2d 495, 498 (9th Cir. 1953) ("it is of course true that the California courts, in common with authorities generally, recognize a cause of action based on unjust enrichment").

Notwithstanding the apparent confusion over the viability of a cause of action for unjust enrichment, for the most part, courts finding that California does not allow an "unjust enrichment" cause of action have made essentially semantic arguments—focusing on the interrelationship between the legal doctrine of unjust enrichment and the legal remedy of restitution. See, e.g.,  Lauriedale, 7 Cal. App. 4th at 1448;  McBride, 123 Cal. App. 4th at 387.

Moreover, in both McBride and Lauriedale, cases upon which defendants strongly rely, the courts found that although labeled "unjust enrichment," the causes of action could be understood as claims for restitution.[14]  This is precisely the situation in the present action.  Although their Eighth cause of action is entitled "unjust enrichment" it is clear that plaintiffs are seeking restitution.

United States District Court

For the Northern District of California

1    Plaintiffs allege that defendants improperly benefitted from fraudulent activities and thus plaintiffs

2    seek "*restitution* from [d]efendants, and each of them, and an order disgorging all profits, benefits,

3    and other compensation obtained by [d]efendants."  FAC ¶ 106 (emphasis added).  Here, as in

4    McBride, plaintiffs may assert a claim for restitution based on a theory of unjust enrichment.  See,

5    e.g. 1 Witkin Sum. Cal. Law Contracts § 1013 ("the right to restitution or quasi-contractual recovery

6    is based upon unjust enrichment.  Where a person obtains a benefit that he or she may not justly

7    retain, the person is unjustly enriched.").

8        Furthermore, although plaintiffs  restitution claim under their eighth cause of action may

9    ultimately be superfluous to their restitution claim under section 17200,[15] it is inappropriate at the

10   motion to dismiss stage to make that determination, as plaintiffs may prevail in one cause of action

11   and not in the other.  Accordingly, defendants' motion to dismiss plaintiffs' eighth cause of action is

12   DENIED.

13

14   V.    Declaratory Relief

15        Defendants move to dismiss plaintiffs' request for relief under the Declaratory Judgment Act,

16   28 U.S.C. section 2201, contending that (1) since plaintiffs have already suffered damages for the

17   allegedly fraudulent misrepresentations declaratory relief is superfluous and thus their claim does

18   not comport with the rationale underlying the Declaratory Judgment Act and (2) since a tort is

19   alleged, declaratory relief adjudicating the liability of the defendant is inappropriate.

20        "The Declaratory Judgment Act confers on federal courts unique and substantial discretion in

21   deciding whether to declare the rights of litigants." Wilton v. Seven Falls Co., 515 U.S. 277, 286–87

22   (1995); Greater Los Angeles Council on Deafness, Inc. v. Zolin, 812 F. 2d 1103, 1112 (9th Cir.

23   1987) (citing Doe v. Gallinot, 657 F.2d 1017, 1024 (9th Cir. 1981)); 12 MOORE'S FEDERAL

24   PRACTICE (3d Ed. 2005) § 57.40.  Pursuant to section 2201, any court "*may* declare the rights and

25   other legal relations of any interested party seeking such declaration, *whether or not further relief is*

26   *or could be sought*." 28 U.S.C. § 2201(a) (emphasis added).   Additionally, the Supreme Court has

27   noted that declaratory relief may be considered independently even if there are other appropriate

28   forms of relief.  Powell v. McCormack, 395 U.S. 486, 499 (1969).

United States District Court

For the Northern District of California

1      It is clear that the court has the discretion to allow or deny declaratory relief. However, at

2  the pleading stage, this court finds that this decision is premature. If plaintiffs succeed in their cause

3  of action for damages and restitution under the CLRA, then declaratory relief may very well be

4  superfluous and subject to dismissal by this court. Absent such a determination, defendants' motion

5  to dismiss plaintiffs' claim for declaratory relief is DENIED.

6

7  VI.    <u>Liability of Cendant Corporation</u>

8      Defendant Cendant moves separately to dismiss all of plaintiffs' claims against the former

9  parent company. First, Cendant asserts that plaintiffs have failed to adequately allege any claims

10  against it for direct liability. Second, defendants contend that plaintiffs cannot show that Cendant is

11  the alter ego of Trilegiant or otherwise vicariously liable as their pleadings rely on conclusory

12  allegations offered with no factual support.

13      In response to defendants' motion, plaintiffs do not point to any factual allegations that

14  support a finding that Cendant should be held directly liable. Rather, plaintiffs implicitly concede

15  the point, arguing that Cendant is liable through multiple indirect liability theories such as alter ego,

16  joint enterprise, conspiracy, RICO conspiracy, agency and aiding and abetting. However, none of

17  plaintiffs theories of indirect liability can withstand the current motion to dismiss.

18      First, plaintiffs cannot meet either of the two prongs that are required to assert alter-ego

19  liability. <u>See</u> <u>Hollywood Cleaning & Pressing Co. v. Hollywood Laundry Serv. Inc</u>., 217 Cal. 124,

20  129 (1932) (finding that in order to pierce the corporate veil, plaintiff must show that inequity will

21  result and that a subsidiary is a mere instrumentality of the parent corporation); <u>Sonora Diamond</u>

22  <u>Corp. v. Superior Court</u>, 83 Cal. App. 4th 523 (2000). For a court to pierce the corporate veil it must

23  determine that there is bad faith conduct on the part of the parent corporation that would otherwise

24  remain without remedy. <u>See</u> <u>Sonora Diamond</u>, 83 Cal. App. 4th at 539. In overturning the district

25  court's finding that a shareholder of a parent who exercised significant control was the alter ego of

26  the subsidiary, the Ninth Circuit held in <u>Katzir's Floor & Home Design, Inc. v. M-MLS.com</u> that

27  "the injustice that allows a corporate veil to be pierced is not a general notion of injustice; rather, it

28  is the injustice that results only when corporate separateness is illusory." 394 F.3d 1143, 1149 (9th

United States District Court

For the Northern District of California

Cir. 2004) (internal citations omitted).  The court noted that factors signaling that it would be inequitable to respect separate corporate identities included "inadequate capitalization, commingling of assets, [or] disregard of corporate formalities." Id. (internal citations omitted).  None of these factors have been alleged here.  Not only is there no indication in the complaint that Trilegiant is undercapitalized, instead plaintiff alleges that Trilegiant generates substantial revenues independent of Cendant, recording revenues in 2004 of as much as $994 million.  FAC ¶ 4.  Additionally, at the December 12, 2005 case management conference, in response to a query as to Trilegiant's financial condition, plaintiffs noted that they did "not believe [Trilegiant] is on the edge, no . . . we don't have any reason to believe that [Trilegiant] is in poor financial condition . . .".  Posner Dec., Exh. A at 6:17–24, 7:25–8:2.

In addition, plaintiffs do not allege, absent conclusory statements, that Trilegiant is merely an instrumentality of Cendant.  All that plaintiffs offer in support of their alter ego claims are allegations that Trilegiant is a subsidiary controlled by Cendant and that Cendant has majority representation on Trilegiant's board.  However, it is clear that such routine control of a subsidiary by a parent is insufficient to support the contention that a subsidiary is a mere instrumentality.  See, e.g. Institute of Veterinary Pathology, Inc. v. California Health Labs., Inc., 116 Cal. App. 3d 111, 119–20 (1981) (noting that even ownership of 100% of subsidiary's stock is insufficient to pierce the corporate veil).[16]  See also Katzir, 394 F.3d at 1149 ("the mere fact of sole ownership and control does not eviscerate the separate corporate identity that is the foundation of corporate law").  Based on the lack of any pleaded facts supporting either the notion that inequity will result or that Trilegiant is a mere instrument of Cendant, plaintiffs' alter ego claims must fail.

Plaintiffs' theories of aiding and abetting and vicarious liability are similarly unavailing as plaintiffs do not make any specific factual allegations about any actions taken by Cendant that establish that it should be found indirectly liable for Trilegiant's allegedly wrongful acts.  Rather, in their response to defendants' motion, plaintiffs merely restate the conclusory allegations found in the complaint.  Given the foregoing, defendants motion to dismiss all claims against Cendant is hereby GRANTED.  However, Cendant remains potentially liable under RICO if plaintiffs are able to

1  successfully amend their RICO allegations.

2

3  VII.    Leave to Amend

4          The Federal Rules of Civil Procedure provide that leave to amend be "freely given when

5  justice so requires." Fed. R. Civ. Pro 15(a).  The Ninth Circuit has construed this broadly, requiring

6  that leave to amend be granted with "extraordinary liberality."  Morongo Band of Mission Indians v.

7  Rose, 893 F.2d 1074, 1079 (9th Cir. 1990).  In determining whether it should grant leave to amend a

8  complaint, the court must consider (1) the plaintiff's bad faith; (2) undue delay; (3) prejudice to the

9  defendant; (4) futility of amendment; and (5) whether the plaintiff has previously amended his or her

10  pleadings.  Nunes v. Ashcroft, 375 F.3d 805, 808 (9th Cir. 2004) (citing Bonin v. Calderon, 59 F.3d

11  815, 845 (9th Cir. 1995)), reh'g and reh'g en banc denied, 375 F.3d 810 (9th Cir. 2004), cert. denied,

12  ___ U.S. ___, 125 S. Ct. 1395 (2005).  Plaintiffs have only amended their pleadings once previously on

13  their own initiative and there is no indication that defendants will suffer any prejudice or undue

14  delay from a second amendment.  The court, therefore, GRANTS plaintiffs leave to amend their

15  claims under RICO, the EFTA and the CLRA consistent with the provisions of this order.

16

17  CONCLUSION

18          The court orders the following with respect to defendants' motion to dismiss:

19          1) with respect to the RICO claims the motion is GRANTED with leave to amend consistent

20  with this order;

21          2) with respect to the EFTA claims the motion is GRANTED with leave to amend consistent

22  with this order;

23          3) with respect to the CLRA claims the motion is GRANTED without leave to amend as to

24  plaintiff Smith; without leave to amend as to plaintiff Nordberg on the section 1770(a)(1), (3), (5)

25  and (9) claims; with leave to amend consistent with this order as to the section 1770(a)(16) claim;

26  and without leave to amend as to the unconscionable contract provision claims; and DENIED with

27  respect to section 1770(a)(14);

28

United States District Court

For the Northern District of California

1      4) with respect to the unjust enrichment and declaratory relief claims the motion is DENIED;

2      5) with respect to the claims against Cendant the motion is GRANTED as to all claims

3   without leave to amend.

4      Plaintiffs shall file their amended complaint within twenty (20) days of the date of this order.

5

6

7

8   IT IS SO ORDERED.

9   Date:   April 3, 2006                    _____

10                                          MARILYN HALL PATEL
                                            United States District Court Judge
11                                          Northern District of California

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

24

**ENDNOTES**

1. Unless otherwise noted, these facts are taken from the plaintiffs' first amended class action complaint (hereinafter "the complaint" or the "FAC").

2. Section 1962(c) specifically provides:

> It shall be unlawful for any person employed by or associated with any *enterprise* engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such *enterprise's* affairs through a pattern of racketeering activity or collection of unlawful debts.

18 U.S.C. § 1962(c) (emphasis added).

3. At oral argument, plaintiffs conceded that they were no longer advancing this theory. Rather, plaintiffs asserted, their RICO enterprise consists of an association-in-fact.

4. At oral argument, plaintiffs made an unpersuasive argument that the control mechanism is evidenced by the consent given by the parties in entering into the contractual arrangements.

5. At oral argument, plaintiffs argued that the requirements for notice pleading under RICO are very broad and as such they are not required to identify the members of their association-in-fact. See, e.g. Richmond v. Nationwide Cassel L.P., 52 F.3d 640, 645 (7th Cir. 1995) (where the court dismissed RICO claims for failure to name third-party enterprise members). Aside from a passing reference to Budget-Rent-A-Car as a possible third-party contractor, plaintiffs do not provide any detail on which entities comprise the enterprise—stating only that defendants enter into these agreements with "financial institutions, retailers, telephone service providers, car rental companies, mortgage lenders, hotels, cable companies, and Internet service providers—many of whom are Fortune 500 companies." FAC ¶ 20.

6. At oral argument, plaintiffs made a new assertion that the unnamed partners and Trilegiant shared in the profits gained from the membership profits. However, it appears that this new argument is merely an attempt to recast plaintiffs' allegations that the consideration that was given by Trilegiant to these third parties for the financial information of their customers was not a routine business transaction but an improper distribution of assets procured through fraud. The complaint does not make any allegations that these unnamed partners were aware of or collaborated with Trilegiant in the allegedly tortious activities—neither does it allege that any profits from these activities were "shared" by the parties. The mere receipt of consideration for the sale of financial information of customers does not establish that these unnamed parties shared in the profits of the alleged enterprise.

7. Case law from this District has held that an "association-in-fact enterprise" was adequately alleged where the plaintiff alleged that a proposal "team" was formed to compete for various contracts. NSI Tech. Serv. Corp. v. National Aeronautics, No. 95-20559 SW, 1996 WL 263646 at *2 (N.D. Cal. April 13, 1996) (Williams, J.) (citing Chang, 80 F.3d at 1300). The NSI Tech court further held that the teams had an existence apart from the pattern of racketeering activity because of their participation in the various extraneous activities of the two component corporations. However, the court based its decision on the fact that the teams were separate and distinct entities created out of a contractual relationship. That is not the case here.

8. Electronic fund transfers include, *inter alia*, point-of-sale transfers, automated teller machine transactions, direct deposits or withdrawals of fund, and transfers initiated by telephone. Id.

9.  Although plaintiffs' reference the Official Staff Commentaries and quote language directly from this section in their opposition, they erroneously cite to Appendix C of Regulation E.

10.  Cases cited in support of defendants' novel contention do not address the issue at hand.  See Lee v. General Nutrition, 2001 U.S. Dist. LEXIS 24739 (C.D. Cal. 2001) (finding goods were acquired for "personal" as opposed to business reasons); Stahle v. Network Solutions, Inc., 2003 Cal. App. Unpub. LEXIS 11313 (2003) (noting relief not available to a third- party beneficiary).

11.   Defendants' obscure citation to a purported section of legislative history is misleading and ultimately a mischaracterization of the text of the CLRA. The document cited by defendants simply annotates a draft of the National Consumer Act which was prepared by an East Coast Law Center.  The reference to an "Assembly Final History" incorrectly suggests that the drafters of the CLRA relied on this National Consumer Act as a model.  The court is at a loss as to why defendants would resort to this misleading citation when the plain statutory language in fact supports their position.

12.  At oral argument, plaintiffs emphasized Massachusetts Mutual Life Ins. Co. v. Superior Ct., 97 Cal. App. 4th 1282 (2002), rev. denied, 2002 Cal. Lexis 5049 (2002), and Wang v. Massey Chevrolet, 97 Cal. App. 4th 856 (2002).  The Massachusetts Mutual case concerned representations by an insurance company concerning its high discretionary dividends and its failure to disclose to plaintiff purchasers its intention to substantially "ratchet down" such dividends in the future.  97 Cal. App. 4th at 1286.  Similarly, Wang involved oral misrepresentations made by defendant auto dealer in the course of plaintiffs' purchase of a Suburban Sport Utility Vehicle (SUV).  The Wang court held that the parol evidence rule could not be invoked to exclude evidence of oral misrepresentations in connection with a contractual transaction for the purposes of section 1770(a)(14) of the CLRA.  97 Cal. App. 4th at 869-870.  In both Wang and Massachusetts Mutual the alleged misrepresentation or omission occurred in the clear context of an underlying transaction, whether in the purchase of an insurance policy or an SUV.  Absent such an underlying transaction in the present case, defendants' alleged "omission" is not actionable under the CLRA.

13.  In an apparent typographical error, plaintiffs cite to subsection (17) of section 1770(a) which does not deal with unconscionable contracts.

14.  In McBride,  the court denied restitution, citing public policy concerns that granting such an award to an individual who had expended funds to support a child believing he was the father would be potentially detrimental to the financial needs of the child.  Similarly, in Lauriedale, the court denied restitution, finding that it would be patently inequitable for a director who had breached fiduciary duties to seek restitution from those he had harmed.

15.  The California Unfair Competition Law is equitable in nature and plaintiffs that prevail under the UCL are "generally limited to injunctive relief and restitution."  Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1144 (2003) (citing Bank of the West v. Superior Ct., 2 Cal. 4th 1254, 1266 (1992)).

16.  As in the case of plaintiffs' new enterprise theory, the court is barred from considering plaintiffs' reference to language in defendants' Form 10-K filed with the Securities and Exchange Commission for fiscal year ending December 31, 2004.  In any event, this reference does not lend any support to plaintiffs' alter ego theory.